# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RESIDENTIAL CONSTRUCTORS, LLC, )
                               )
                Plaintiff, )     Case No.  2:05-cv-01318-BES-GWF
                               )
vs. )     **ORDER**
                               )
ACE PROPERTY AND CASUALTY )
INSURANCE COMPANY, )
                               )
              Defendant. )
_____ )

       This matter is before the Court on Plaintiff's Motion to Compel Production of Documents and Request for Sanctions (#80), filed on August 21, 2006; Ace Property and Casualty Insurance Company's Response to Plaintiff's Motion to Compel Production of Documents and Request for Sanctions (#87), filed on September 8, 2006; and Plaintiff's Reply Memorandum of Points and Authorities in Support of Motion to Compel Production of Documents and Request for Sanctions (#94), filed on September 22, 2006.  The Court held a hearing in this matter on October 6, 2006.

## FACTUAL BACKGROUND

       This case involves claims by Plaintiff Residential Constructors, LLC against its insurer, Defendant ACE Property and Casualty Insurance Company, arising from the denial of insurance coverage under an "all risk" policy for property damage sustained to Plaintiff's Metropolis Lofts building project during the course of construction.  The basis of Defendant's denial of coverage was that the loss and damage sustained by Plaintiff was excluded from coverage pursuant to the policy's "rain exclusion."  Plaintiff's Complaint (#1), filed on November 1, 2005, alleges causes of action

1  against Defendant for breach of the insurance contract, breach of the implied covenant of good faith and

2  fair dealing, violation of the Nevada Unfair Claims Practices Act, NRS 686A.310, and declaratory

3  relief.[1]

4       Plaintiff's instant *Motion to Compel (#80)* deals with two distinct discovery disputes.  The first

5  involves Plaintiff's allegation that it was misled by the inclusion of the "rain exclusion" in the insurance

6  policy.  Plaintiff seeks production of other "all risk" insurance quotations, binders and policies issued

7  by Defendant, its affiliates and agents.  Defendant has objected to Plaintiff's requests for the production

8  of these documents on grounds that they are irrelevant and would be unduly burdensome and expensive

9  for Defendant to produce.

10      On January 14, 2004, Defendant's agent/broker issued an insurance quote or offer to Plaintiff

11  for a policy of builder's risks insurance.  *Motion (#80), Exhibit "1".*   The quote offered to issue a

12  policy providing coverage for "Construction All Risk of Direct Physical Loss or Damage, including

13  flood and earth movement."  *Id.*  The quote listed the proposed policy limits and deductibles for various

14  coverages and the proposed premium.  The quote referred to "Coverage Form: Ace USA Builders Risk

15  Large Accounts."  The quote also contained a section entitled "Terms and Conditions," which included

16  the following:

17                    Mandatory Exclusions/Amendments: All policy form exclusions
                      including but not limited to Pollution & Contamination, Asbestos,
18                    Terrorism, Electronic Data/Cyber risk and Mold/Fungus.

19  *Id.*

20      Plaintiff accepted Defendant's quote and Defendant's agent/broker issued a binder of insurance

21  with a policy effective date of January 21, 2004 and a policy expiration date of August 21, 2005.

22  *Motion (#80), Exhibit "1".*  The binder contained essentially the same information as the quote.  The

23  "Coverage" provided was:  "Construction All Risk of Direct Physical Loss or Damage, including flood

24  and earth movement."  The "Form" listed was "Ace USA Builders Risk Large Accounts."  The binder

25  "Conditions" included the following:

26  _____

27      [1]On September 28, 2006, Plaintiff filed a *Motion for Leave to File First Amended Complaint*
    *(#101)* to add claims for fraud and reformation of the insurance contract.  This motion has yet to be
28  decided.

2

Mandatory Exclusions/Amendments:

 All policy form exclusions including but not limited to Pollution & Contamination, Asbestos, Terrorism, Electronic Data/Cyber risk and Mold/Fungus.

Plaintiff contends that the actual insurance policy was not delivered to it until October 2004, shortly before the first occurrence of property damage to Plaintiff's project.  *Plaintiff's Motion (#80), page 3.*  The declarations page of the insurance policy delivered to Plaintiff stated that the coverage form was "Builders Risk Xtra."  The policy, however, contained a "Project Builders Risk" policy form which contained the following exclusion for loss or damage caused by:

S.    Rain, snow, sleet, sand, or dust, whether driven by wind or not, to the interior of any building or structure, or the property inside the building or structure, unless the building first sustains Windstorm or Hail damage to its roof, windows or walls through which rain, snow, sleet, sand or dust enters.

*Complaint (#1), Exhibit "A".*

Discovery in this case has revealed that Defendant did not actually have or use an "Ace USA Builders Risk Large Accounts" coverage form referenced in the insurance quote and binder.  According to Defendant, the coverage form listed in the quote and binder "was a form description, not a verbatim quoted title of the form itself."  *Defendant's Response (#2), page 2, Exhibit "1", Johnson Declaration,* ¶ 3.  According to Defendant, the "Builder Risk Xtra" policy form is the policy form used for standard risks.  *Id., Exhibit "1", Johnson Declaration,* ¶ 4.  Defendant states that it has produced to Plaintiff copies of the standard "stand alone" builders risk policy forms currently in use, which would include the period covered by the policy issued to Plaintiff.[2]  These forms are a "Builders Risk Xtra" form, dated 7/97, that was used during all of 2003 and most of 2004, a "Builders Risk Xtra" form, dated 12/04, that came into use at the end of 2004, and a "Builders Risk Xtra" form, dated 10/05, that is currently in use.  Defendant states that the "Builders Risk Xtra" form(s) is generally used by Defendant's Inland Marine Division, except in the case of large risk, in excess of $50,000,000, or some

_____

[2]According to Defendant, all risk coverage may be included as a form of coverage in a variety of policies issued by Defendant.  This case involves a "stand alone" all risk, course of construction insurance policy, and Defendant has limited its production of other policy forms to similar "stand alone" policy forms.

1   otherwise specialized risk.

2          Defendant states that in the case of specialized risk, or when it was requested and approved for

3   large risk, Defendant uses a "Project Builders Risk" form such as the one included in the policy

4   delivered to Plaintiff.  Defendant states that it has also produced to Plaintiff an undated "Project

5   Builders Risk" form that was in use during the time period January 1, 2003 to December 31, 2004,

6   which would cover the time period in which the policy issued to Plaintiff was quoted, bound, issued

7   and delivered.   Defendant has also produced a "Project Builders Risk" form, dated 01/05, which is the

8   form currently in use.  Defendant also states that from time to time it issues "manuscript policies"

9   which are policies drafted for a specific customer/insured and whose terms and conditions are subject to

10  specific negotiation between the insurer and the insured.

11         The second discovery dispute relates to Plaintiff's motion to compel Defendant to produce

12  certain documents regarding its investigation of the claim and coverage dispute which Defendant has

13  withheld based on privilege.  Following the subject loss and damage to Plaintiff's project in November

14  and December 2004, Defendant employed an independent adjuster, Mark Brown of GAB Robins North

15  America, Inc., to conduct an initial coverage investigation.  After Defendant completed its coverage

16  investigation, Defendant sent a January 27, 2004 letter to Plaintiff denying coverage for the loss and

17  damage based on the above quoted "rain exclusion" in the insurance policy.

18         On February 7, 2005, Plaintiff's counsel sent a letter to Defendant's adjuster disputing the denial

19  of coverage and requesting that Defendant reconsider its coverage denial.  On February 25, 2005,

20  Defendant's counsel, C. Michael Johnson, advised Plaintiff's counsel that Defendant agreed to further

21  investigate and reconsider the denial of coverage without waiving any of Defendant's rights.

22  Defendant's counsel's letter stated that a different adjuster for GAB Robins North America, Inc.,

23  Wayne Sowers, was being assigned to perform this further coverage investigation.  During the

24  subsequent investigation, Defendant also employed a consultant with construction expertise, MKA, to

25  assist in the coverage investigation.  Defendant's coverage counsel, Mr. Johnson, communicated with

26  the Defendant and the representatives for GAB Robins North America, Inc. and MKA.  These

27  communications included exchanging drafts of reports and proposed correspondence to Plaintiff and e-

28  mail communications regarding the same.  After completing the follow-up coverage investigation,

1  Defendant's counsel sent a 19 page letter to Plaintiff's counsel on September 23, 2005, outlining the

2  investigation conducted by Defendant, GAB and MKA, and concluding that the loss and damage were

3  excluded by the rain exclusion.  This lawsuit followed.

4          Defendant represents that it has produced to Plaintiff all of the claims files, logs, reports, etc, of

5  Defendant, GAB Robins North America, Inc. and MKA, with the exception of those documents which

6  reference communications with Defendant's counsel and/or which discuss confidential attorney-client

7  communications and legal advice provided by Defendant's counsel.  Following the hearing on October

8  6, 2006, Defendant provided the withheld documents for *in camera* review by the Court.

9                                           **DISCUSSION**

10         **1.     Plaintiff's Motion to Compel Production of Other Insurance Quotes,**
           **Binders and Policies Issued by Defendant**.

11

12         Plaintiff seeks to compel Defendant to produce from January 1, 2000 all quotes, binders and

13  policies relating to Defendant's builder risk policy forms entitled "ACE USA Project Builder's Risk,"

14  "ACE USA Builder's Risk Large Accounts," and "ACE USA Builder's Risk Xtra."  *See Plaintiff's*

15  *Motion (#80), Exhibit "9", Defendant's Responses and Objections to Requests for Production,  Nos.*

16  *36-38.*  Defendant objected to these requests on the grounds that they do "not seek discovery of the facts

17  of this case or the policy at issue."  The Court reads this as an objection to relevancy.  Defendant also

18  objects that the requests are overbroad, unduly burdensome and would impose an unreasonable burden

19  on Defendants to assemble the documents requested by Plaintiff.  Defendant also asserts that it would

20  be impossible or extremely difficult to locate, assemble, and produce quotes regarding policies that

21  were never issued.[3]

22

23  _____

24         [3]Defendant also objected to the overbreadth of the requests because the Requests define the
    Defendant, i.e., "YOU," to include Defendant ACE P&C and "each of its parents, subsidiaries,

25  affiliates, agents, assigns, attorneys, employees, officers, directors, accountants, representatives,
    consultants, or others acting or purporting to act on their behalf."   The Court would understand and

26  construe the requests, however, as being limited to Defendant, including predecessor, successor or
    affiliated entities, and agents or brokers who are authorized to issue builder risk policy quotes, binders

27  or builder risk insurance policies on Defendant's behalf.

28

1    Fed.R.Civ.Pro. 26(b)(1) generally provides that parties may obtain discovery regarding any

2  matter, not privileged, that is relevant to the claim or defense of any party.  Within the limitation that it

3  relates to a claim or defense, relevancy is broadly construed.  Rule 26(b)(2) also provides, however, that

4  the frequency or extent of the use of discovery methods authorized under the rules shall be limited by

5  the court if it determines that (i) the discovery sought is unreasonably cumulative or duplicative, or is

6  obtainable from some other source that is more convenient, less burdensome or less expensive or (iii)

7  the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the

8  needs of the case, the amount in controversy, the parties' resources, the importance of the issue at stake

9  in the litigation, and the importance of the discovery in resolving the issues.

10    **A.    Relevance.**

11    It is not surprising that Plaintiff would raise issues regarding the insurance policy form issued to

12  it, given that the insurance quote and binder referred to an "Ace USA Builders Risk Large Accounts"

13  coverage form, the policy declarations page refers to a "Builders Xtra" form, but the policy itself

14  contains a  "Project Builders Risk" form.  Plaintiff's *Complaint (#1)* alleges that Defendant

15  misrepresented pertinent facts or policy provisions, including failing to provide Plaintiff with a copy of

16  the policy in a timely manner.  *Id.*, ¶¶ 17.a.,  21.a.  Plaintiff's *Proposed First Amended Complaint*

17  *(#102)* also seeks to allege claims for fraud and reformation of the policy based on the allegedly

18  misleading description of the coverage form in the insurance quote and binder.  Plaintiff argues that

19  Request Nos. 36-38 are relevant to its existing claims, as well as to its proposed claims for fraud and

20  reformation.  In this regard, Plaintiff alleges that without its knowledge or consent, Defendant delivered

21  a policy containing the "Project Builders Risk" policy form containing the subject exclusion.  Plaintiff

22  also argues that it was misled because neither the quote nor the binder listed the "rain exclusion" as one

23  of the applicable exclusions in the policy.

24    Plaintiff relies on *Albert H. Wohlers & Co. v. Bartgis*, 114 Nev. 1249, 969 P.2d 949 (1998), that

25  an underwriter's concealment or misrepresentation of coverage limitations supports a claim for bad

26  faith and punitive damages.  Plaintiff also cites "hornbook law" that an insurer cannot avoid liability by

27  issuing a policy at variance with the binder.  *See* Couch on Insurance 3d. § 13:1.  Plaintiff also cites *Hilt*

28  *Truck Lines v. Riggins*, 756 F.2d 676, 678-79 (8th Cir. 1985), which holds that where an insured acts in

6

1   reliance on a binder for "all risk" coverage, the insurer cannot retroactively change the terms of the

2   binder based on a subsequently issued policy which excludes the loss.  Defendant argues, however, that

3   Plaintiff received the insurance policy prior to the alleged loss and was required to read the policy and

4   is bound by its terms.  *See Farmers Ins. Exchange v. Young*, 108 Nev. 328, 832 P.2d 2376, 378 (1992);

5   *Schroeder v. State Farm Fire and Cas. Co.*, 770 F.Supp. 558 (D. Nev. 1991); and *Farmers Ins.*

6   *Exchange v. Neal*, 119 Nev. 62, 64 P.3d 472, 473 (Nev. 2003).

7          The Court is called upon to decide a discovery dispute and not to decide the ultimate issue

8   whether Plaintiff has viable claims for  breach of contract, bad faith, fraud or reformation based on

9   alleged misrepresentations made by Defendant in issuing the quote or binder.  The basis and strength of

10  Plaintiff's claims, however, are factors that the Court should consider in determining whether the

11  burden or expense of the proposed discovery outweighs the likely benefit of the discovery given the

12  importance of the issues and the discovery needed to resolve those issues.  Rule 26(b)(2)(iii).

13         Nevada Revised Statute (NRS) 687B.015 states that a binder is a contract for temporary

14  insurance which is used when a policy is not immediately issued to evidence that coverage attaches at a

15  specified time and continues until the policy is issued or the risk is declined.  The "hornbook law" to

16  which Plaintiff refers also states: "The binder or receipt binds the insurer according to its terms, and to

17  the extent they are not set forth, the insurer is bound by the terms and conditions of the policy ordinarily

18  issued by it to insure like risks."  1A Couch on Insurance 3d. § 13.6.

19         As *World Trade Center Properties, LLC v. Hartford Fire Ins. Co., et.al.,* 345 F.3d 154, 166, 169

20  (2d Cir. 2003) (applying New York law), states, an insurance binder is a unique type of contract. It is an

21  informal device to record the giving of protection pending the execution and delivery of a more

22  conventionally detailed policy of insurance.  A binder, while an enforceable contract in its own right, is

23  necessarily incomplete in some respect, otherwise a subsequent formal policy would be unnecessary.

24  Thus, terms must often be implied to determine the obligations to which the parties intended to be

25  bound.  To determine the contents of a binder, the courts generally look to (1) the specific terms

26  contained in the binder or incorporated by reference and (2) to the extent necessary as gap-fillers, the

27  terms included in the usual policy currently in use by the insurance company or those required by

28  statute.  Generally, a binder is terminated by the issuance, delivery and acceptance of the formal

7

1   insurance policy, within whose terms the binder is merged.  *In re Waste Systems International*, 317

2   B.R. 650, 656 (D. Del. 2004), *citing* 1 Couch on Insurance 3d. §§ 13.8 and 13.9.  Although *In re Waste*

3   *Systems International* states that in the case of conflict or ambiguity the policy controls, this is not the

4   rule if the policy actually conflicts with a specific term of the binder.  *Wetherell v. Sentry Reinsurance,*

5   *Inc.*, 743 F.Supp. 1157, 1170 (E.D. Pa.  1990), *citing Republic Ins. Co. v. French*, 180 F.2d 796 (10th

6   Cir. 1950).  In such latter cases, the binder controls because it represents the actual agreement of the

7   parties.  *Hilt Truck Lines v. Riggins*, 756 F.2d 676, 678-79 (8th Cir. 1985), holds that it is the insurer's

8   burden to prove whether its customary policy form excludes a particular risk or loss.  In that case, the

9   insured suffered a loss after the binder was issued, but before the policy was delivered.  Because the

10  insurer failed to present evidence that a particular exclusion was ordinarily included in its policy, the

11  court held that the loss was covered.

12         In this case, the insurance policy was delivered to Plaintiff before the November-December

13  2004 loss.  Although Plaintiff had an obligation to read the insurance policy, if the policy was, in fact,

14  at variance with the terms set forth in the binder, this would not preclude Plaintiff's right to pursue a

15  claim for fraud or contract reformation.  In addition, Plaintiff argues that it did not receive the policy

16  until October 2004 and arguably did not have an adequate opportunity prior to the loss to determine that

17  the policy was not in accordance with the coverage it bargained for in January 2004.  Plaintiff argues

18  that it needs to obtain discovery regarding all of Defendant's other quotes, binders and policies because

19  they may help show that Defendant misrepresented pertinent facts and/or insurance policy provisions

20  relating to coverage at issue.  *See Reply (#94), page 5*.  To support a claim of fraud, however, Plaintiff

21  must prove not only that Defendant made a misrepresentation, but that Plaintiff also justifiably relied

22  upon the misrepresentation to its detriment.  *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.,*

23  120 Nev. 277, 89 P.3d 1009, 1018 (2004); *Manhattan Associates, Inc. v. Pan Western Corp.*, 2006 WL

24  2482420 (D. Nev. 2006).

25         Plaintiff argues that the reference in the quote and binder to the "Coverage Form" for the "ACE

26  USA Builders Risk Large Accounts" was misleading.   Plaintiff does not explain, however, on what

27

28

1   basis, if any, it believed this coverage form would not include a "rain exclusion." [4]  According to the

2   excerpts of the deposition of Scott Wolf of Colemont Insurance Brokers attached to Plaintiff's *Motion*

3   *(#80)*, *Exhibit "1"*, he and his brokerage company act as broker for many insurers besides Defendant.

4   *Id., Deposition page 20.*  Mr. Wolf testified that he obtained the typed or printed quote from Defendant

5   which stated that the "Coverage Form" would be the "ACE USA Builders Risk Large Accounts" form.

6   He further testified, however, that to his knowledge he had never seen this form.  *Id., Deposition page*

7   *63.*  Mr. Wolf was asked if there was anything in the quotation issued to Plaintiff that he understood to

8   be a reference to the "rain exclusion."  After first answering "yes", Mr. Wolf corrected himself and

9   testified as follows:

10                   A.  Just – no.  I told you 99 percent of the policies that I write that
                 are builder's risk include that exclusion similar to such as that as a ISO
11                 form.
                 . . .
12                   A.  There's no specific reference to an endorsement – an
                 exclusion.  But you said would I expect it or – yeah, I would expect that it
13                 would be in there.

14   *Id., Deposition page 64.*

15          Mr. Wolf was then asked if he knew whether the specific coverage form listed in Defendant's

16   insurance quote has a "rain exclusion."  Because Mr. Wolf had not seen that particular form, he did not

17   know whether it contained a "rain exclusion."  Because Defendant states that it did not actually use a

18   coverage form entitled "ACE USA Builders Risk Large Accounts," it cannot produce policies written

19   on this fictitiously or erroneously titled form.

20          Plaintiff also contends that the insurance quote and binder issued by Defendant was misleading

21   because it contained no specific reference to "rain exclusion."  The quote and binder state as follows:

22

23

24          [4]Plaintiff's pending *Motion for Leave to File First Amended Complaint (#101)*, page 4, argues
         that had it known the Large Accounts Form at issue did not exist and was simply a marketing ploy
25       designed to ensnare unsuspecting insureds, Plaintiff would never have purchased the policy in the first
         instance and "would not have foregone the opportunity to bind coverage under one of the similarly
26       priced policies offered by ACE's competitors (which, like typical builders risk policies, did not contain
         any "rain exclusion".)  Plaintiff's instant *Motion to Compel (#80)*, however, has not provided any
27       evidence showing that a typical builders risk policy does not contain a "rain exclusion" or that ACE
         received quotes from other insurers to provide all risk insurance without a "rain exclusion."

28

9

1          Mandatory Exclusions/Amendments:

2             *All policy form exclusions including but not limited to* Pollution &
              Contamination, Asbestos, Terrorism, Electronic Data/Cyber risk and
3              Mold/Fungus.  (Emphasis added.)

4        This language on its face does not indicate that the policy exclusions specifically referenced in

5 the quote or binder are the only exclusions to be included in the policy form.  A reasonable insured

6 would not conclude from this language that the only exclusions to be contained in the policy are those

7 specifically listed in the quote or binder.  Absent some other evidence, Plaintiff has not raised a

8 legitimate issue that it was actually misled into believing that it had purchased a policy without a "rain

9 exclusion."

10       *Albert H. Wohlers & Co. v. Bartgis*, *supra,* is factually distinguishable from this case.  In

11 *Wohlers*, the defendant agent persuaded plaintiff to purchase a replacement health insurance policy

12 from Allianz due to a substantial increase in the cost of her existing policy.  The agent and Allianz

13 represented to plaintiff that coverage under the new policy would be substantially equivalent to that

14 under the prior policy.  The agent and Allianz did not call the insured's attention to the substantial

15 limitations on coverage in the Allianz policy compared to that provided in the preceding policy.  In

16 reliance on the defendants' misrepresentations or omissions, the insured agreed to purchase the Allianz

17 policy.  In addition to the misrepresentations, the court found that the coverage limitations in the

18 Allianz policy were ambiguous and that the insurer applied them in an unreasonably restrictive manner.

19 Under these circumstances, the Nevada Supreme Court affirmed a bad faith judgment and award of

20 punitive damages against the agent and the insurer.

21       Unlike *Wohlers*, Plaintiff has not pointed to any affirmative representations made by Defendant

22 or its agents that it would issue a policy without a "rain exclusion."  Plaintiff has not produced any

23 evidence that it discussed with Defendant's agent or broker whether a "rain exclusion" would be

24 included in the policy when coverage was bound in January 2004.  The excerpts of the deposition of

25 Plaintiff's insurance agent, John Prince, attached to Defendant's *Opposition, Exhibit "C", John Prince*

26 *Deposition, pages 241-243,* indicate that there were no specific discussions between the Plaintiff and its

27 own agent regarding obtaining a builder's "all risk" policy without a "rain exclusion."  Nor has any

28 evidence been provided to the Court indicating that Plaintiff or its agent requested Defendant's broker

1   to obtain a policy without a "rain exclusion."  Based on the evidence produced by Plaintiff, the Court is,

2   therefore, unpersuaded that Plaintiff can show that it was actually misled by the insurance quote or

3   binder into believing that it would be issued a policy that did not contain a "rain exclusion."[5]

4       This still leaves the issue of whether the builder's "all risk" policies usually or ordinarily issued

5   by Defendant for similar risks contain a "rain exclusion."  Defendant created a substantially greater

6   issue regarding the policy forms "ordinarily" issued by it, by referring to an "ACE USA Builders Risk

7   Large Accounts" coverage form in the insurance quote and binder that reportedly did not actually exist.

8   In addition, the declarations page of the policy subsequently delivered to Plaintiff refers to a "Builders

9   Risk Xtra" coverage form, but the policy actually contains a "Project Builders Risk" form.  Defendant

10  has explained that the coverage form referred to in the insurance quote and binder  "was a form

11  description, not a verbatim quoted title of the form itself," and Defendant has provided Plaintiff with

12  copies of the all risk policy forms in use prior to, during and after the policy was delivered to Plaintiff

13  and which reportedly contain the "rain exclusion."  The reference to the "Builders Risk Xtra" coverage

14  form in the policy declarations was allegedly due to underwriter error in preparing the policy for

15  delivery to the Plaintiff.

16      In a case where the coverage form listed in the binder conforms to the policy issued to the

17  insured, it may be unnecessary and unduly burdensome to require the insurance company to produce

18  other policies issued by it.  Defendant should expect, however, that serious questions regarding the

19  policy forms actually used by it will be raised where it refers to a particular coverage form in its

20  insurance quote and binder, but issues a policy containing a completely different titled form, and where

21  there is also a disparity between the coverage form listed on the policy declarations page and the form

22  actually included in the written policy.  In such circumstances, the insured should not be required to

23  simply accept the insurer's representations that the policy form issued to it is the one it ordinarily issues

24  to insure such risks.  Plaintiff, therefore, has a legitimate right to conduct discovery to determine

25  whether Defendant's representations about its policy forms are true.

26  

27      [5]In so holding, the Court does not state that Plaintiff cannot establish a basis for its proposed
    claims for fraud or reformation.  The Court only holds that Plaintiff's instant Motion to Compel has not

28  provided evidence that would support such a claim.

11

1    Plaintiff's motion to compel Defendant to produce all quotes, binders and policies regarding

2    any builder's risk policy issued by Defendant or its related affiliates and agents/brokers since January 1,

3    2000, however, is overbroad.  As set forth above, the insurer is bound by the terms and conditions of

4    the policy *ordinarily issued by it to insure like risks*.  In this case, the relevant *insurance policies* are

5    similar "stand-alone" builders risk policies issued by Defendant.  Plaintiff concedes that its requests

6    should be limited to "stand alone" policies.  *See Reply (#94), page 6.*   Because the relevant inquiry

7    relates to the provisions of policies issued by Defendant at the time of the subject policy was bound in

8    January 2004 through the date that the actual policy was issued and delivered to Plaintiff in or about

9    October 2004, the relevant time period for production of other policies should reasonably approximate

10   that period.  The Court reserves the option of ordering a broader period of production, if necessary, to

11   capture a sufficient number of policies to determine the usual or ordinary policy form issued by

12   Defendant.

13          The binders issued in regard to these policies would also be relevant in showing what coverage

14   forms are listed, including whether Defendant referred to the "ACE USA Builders Risk Large

15   Accounts" in other binders and, if so, what policy forms it actually issued in regard thereto.   The Court

16   finds, however, that quotes or binders issued by Defendant in regard to policies that were never issued

17   are irrelevant to determining the usual or ordinary "stand alone" builders policy form used by Defendant

18   on policies issued by it.

19          **B.    Burdensomeness.**

20          As *Diamond State Ins. Co. v. Rebel Oil, Co.*, 157 F.R.D. 691, 696 (D. Nev. 1994) and *Jackson .*

21   *Montgomery Ward & Co.*, 173 F.R.D. 524 (D. Nev. 1997) state, the court has broad discretion in

22   controlling discovery and  determining whether discovery is burdensome and oppressive.  These

23   decisions hold that generalized and unsupported allegations of undue burden are not sufficient to

24   prevent enforcement of a subpoena or to defeat a motion to compel production of documents.  In

25   opposing discovery on grounds of burdensomeness, the objecting party is required to demonstrate that

26   the time and expense involved in responding to the requested discovery will, in fact, be unduly

27   burdensome.  *Cory v. Aztec Steel Bldg., Inc.*, 225 F.R.D. 667, 672 (D. Kans. 2005); *Carlton v. Union*

28   *Pacific. R. Co*., 2006 WL 2220977 (D. Neb. 2006).  A mere statement that complying with the

1  discovery request will require "numerous man hours," for example, is not sufficient.  *Cory v. Aztec*

2  *Steel Bldg., Inc., supra.*  In considering the burden imposed on a party in responding to discovery, the

3  Court should also consider whether the burden is a result of the party's lack of an adequate filing

4  system or method for locating requested information.  *See Baine v. General Motors Corp.,* 141 F.R.D.

5  328, 331 (M.D. Ala. 1991), *citing Alliance to End Repression v. Rochford*, 75 F.R.D. 441 (N.D. Ill.

6  1977) and *Kozlowski v. Sears Roebuck & Co.*, 73 F.R.D. 73 (D. Mass. 1976).  Without factual

7  information regarding how Defendant maintains, organizes, indexes and identifies its policy records,

8  the Court cannot make such an assessment.

9       Defendant's Opposition and the supporting affidavit of its representative, John Berger, paint a

10  "worst-case-scenario" of the burden that would be imposed on Defendant in responding to Plaintiff's

11  requests.  The only information provided by Defendant regarding the actual burden that would be

12  imposed on it, however, is the statement that Defendant would be required "to review thousands of files

13  in multiple offices around the country to determine all of the quotes, binders and policies issued since

14  January 1, 2000, regardless of type, that contained any nature of builder's risk coverage in the policy."

15  *Opposition (#87), Exhibit "2."*   This generalized statement does not provide the "fact specific"

16  demonstration of unreasonable burden required by cases interpreting Rule 26.  Nor does it provide any

17  information as to how Defendant has organized its policy records in order to determine whether that

18  system is reasonably adequate.   The Court has not been provided with any evidence that would cause it

19  to believe that Defendant cannot, with a reasonable expenditure of time and effort, identify "stand

20  alone" all risk builders policies issued by it during a given period and produce copies of those policies.

21       Accordingly, the Court will require Defendant to produce to Plaintiff the "stand alone" builder's

22  risk policies relating to policy forms entitled "ACE USA Project Builder's Risk," "ACE USA Builder's

23  Risk Large Accounts" (if any), and "ACE USA Builder's Risk Xtra" issued by Defendant's "Inland

24  Marine Division" during the period from January 1, 2003 to January 1, 2005.  Defendant shall also

25  produce the binders for those policies.  Based on the limited information presently available to the

26  Court, this scope of production would appear to be sufficient to capture relevant policies issued by

27  Defendant in order for Plaintiff to determine whether the "stand alone" builders all risk policies actually

28  issued by Defendant ordinarily contain the "rain exclusion."

1    **2.      Defendant's Objection to Producing Allegedly Privileged Communications.**

2        The second discovery issue concerns Defendant's assertion of the work-product doctrine and/or

3    attorney-client privilege to certain documents regarding the subject insurance coverage dispute.  As

4    noted above, Plaintiff's Complaint alleges claims for breach of contract and declaratory relief in regard

5    to whether the alleged loss and property damage is excluded from coverage.  Plaintiff's Complaint also

6    alleges claims for breach of the implied covenant of good faith and fair dealing, i.e., "insurance bad

7    faith" and violations of Nevada's unfair claims practices act, NRS 687B.310.  No order severing or

8    staying discovery or trial of the contractual and extra-contractual claims has been entered in this case.

9    Accordingly, discovery regarding these claims may be conducted concurrently.

10       **A.      Work-Product Doctrine.**

11       Defendant represents that it has produced to Plaintiff all of its claims files and records regarding

12   its handling of the claim and relating to its coverage decision both before and after it issued its initial

13   coverage denial letter on January 27, 2005.  The documents that Defendant seeks to protect from

14   production to Plaintiff primarily involve communications between Defendant's coverage attorney, C.

15   Michael Johnson, and representatives of the Defendant and the independent adjusting company, GAB

16   Robins North America, Inc. and construction consultant, MKA, that Defendant employed to investigate

17   the claim and assist the insurer in making its coverage determination.

18       Under Fed.R.Civ.Pro. 26(b)(3), a party may obtain discovery of relevant documents prepared in

19   anticipation of litigation by the other party or its representative, including the other party's attorney,

20   consultant or agent, upon a showing that the party seeking discovery has a substantial need for the

21   materials.  The rule provides, however, that the mental impressions, conclusions, opinions, or legal

22   theories of an attorney or other representative of a party concerning the litigation are generally protected

23   from disclosure.  Although a high degree of protection is accorded to "opinion work product," the

24   protection of these materials is not absolute.  Discovery of opinion work product is permitted in

25   insurance "bad faith" claims because the mental impressions of the insurer's representatives in handling

26   the claim and making coverage decisions are directly *at issue* and the insured's need for the material is

27   compelling.  *Holmgren v. State Farm Mutual Auto. Ins. Co.*, 976 F.2d 573, 577 (9th Cir. 1992).

28       In *Yurick v. Liberty Mutual Ins. Co.*, 201 F.R.D. 465, 473 (D. Ariz. 2001), the court quoted the

14

1  Arizona Supreme Court's decision in *Brown v. Superior Ct.,* 137 Ariz. 327, 670 P.2d 725, 734 (Ariz.

2  1983) in this regard as follows:

> 3  [B]ad faith actions against an insurer, like actions by client against
> attorney, patient against doctor, can only be proven by showing exactly
> 4  *how the company processed the claim, how thoroughly it was considered
> and why the company took the action it did.*  The claims file is a unique,
> 5  contemporaneously prepared history of the company's handling of the
> claim; in an action such as this the need for the information in the file is
> 6  not only substantial, but overwhelming .... The "substantial equivalent" of
> this material cannot be obtained through other means of discovery.

7

8      In this case, Defendant argues that it was in anticipation of litigation with Plaintiff either before

9  its counsel's initial January 27, 2005 letter denying coverage, or at least by February 9, 2005, following

10  receipt of Plaintiff's counsel's February 7, 2005 letter responding to the denial of coverage.  Although

11  Plaintiff disputes this assertion, even if the Court accepts that Defendant was in anticipation of litigation

12  by either date, the strategy, mental impressions and opinion of Defendant's agents regarding the results

13  of their coverage investigation and their decision to deny the claim are not protected from discovery

14  under the opinion work-product doctrine of Rule 26.  As to the documents withheld by Defendant, the

15  only real issue is whether the documents are protected from disclosure under the attorney-client

16  privilege.[6]

17     **B.**     **Attorney-Client Privilege.**

18      This action involves claims for breach of contract and "insurance bad faith" governed by

19  Nevada law.  Accordingly, Nevada law regarding the attorney-client privilege applies.  *See* Fed.R.Evid.

20  501.  NRS 49.095 provides that a client has a privilege to refuse to disclose and to prevent any other

21  person from disclosing confidential communications between himself or his representative and his

22  lawyer or his lawyer's representative made for the purpose of facilitating the rendition of professional

23  legal services to the client by the lawyer.  NRS 49.075 defines a representative of the client as a person

24  having authority to obtain professional services, or to act on advice rendered pursuant thereto on behalf

25

26      [6]A few of the documents withheld by Defendant involve statements made by Defendant's claims
27  personnel concerning the allegations contained in Plaintiff's Complaint, including the allegations of bad
faith.  As to these documents, the Court finds that the work product doctrine applies and protects such
28  documents from disclosure to Plaintiff.

of the client.

The attorney-client privilege is narrowly construed because it impedes the search for truth. *Whitehead v. Nevada Com'n on Judicial Discipline*, 110 Nev. 380, 873 P.2d 946 (1994). Narrowly construed, the privilege protects only confidential communications from a professional legal adviser, acting in his capacity as such, made to the client. *Admiral Ins. v. United States Dist. Court for Dist. of Ariz.*, 881 F.2d 1486, 1492 (9th Cir. 1989). In *Wardleigh v. District Court*, 111 Nev. 345, 352, 891 P.2d 1180 (1995), the Nevada Supreme Court approved the test announced in *Upjohn Co. v. United States*, 449 U.S. 383, 389-97 (1981), regarding application of the privilege to confidential communications between counsel and corporate employees. *Wardleigh* also cited *Admiral Ins. v. United States Dist. Court for Dist. of Ariz.*, 881 F.2d 1486, 1493 (9th Cir. 1989).

In *Upjohn*, the Supreme Court rejected the "control group" test and held that the privilege applies to communications by corporate employees regardless of position when the communications concern matters within the scope of the employee's corporate duties and the employee is aware that the information is being furnished to enable the attorney to provide legal advice to the corporation. *See Admiral Ins. v. United States Dist. Court for Dist. of Ariz., supra,* 881 F.2d at 1492, *citing Upjohn, supra,* 449 U.S. at 294. The Court declined to establish an all-encompassing test for application of the attorney-client privilege to communications with corporate employees. The Court held that each case must be evaluated to determine whether application of the privilege would further the underlying purpose of the attorney-client privilege to encourage candid communications between client and counsel. *Admiral Insurance, supra, citing Upjohn,* 449 U.S. at 395.

Thus, in *Yurick v. Liberty Mutual Ins. Co.*, 201 F.R.D. 465, 468-69 (D. Ariz.2001), the court held that confidential communications between counsel and the insurer's claims officers regarding the insurer's legal rights and options were privileged. *See also State Farm Fire & Cas. Co. v. Superior Court*, 216 Cal.App.3d 1222, 265 Cal.Rptr. 372 (1989); *State ex. rel. Brison v. Kaufman,* 584 S.E.2d 480 (W.Va. 2003). *Yurick* found, however, that certain communications between counsel and claim personnel of the insurer were not privileged because the insurer had not made a sufficient showing that the communications were confidential. *Yurick* also held that email communications are protected by the privilege provided that the elements of the privilege are established. The Nevada Supreme Court

1  agrees with this general proposition. *See City of Reno v. Reno Police Protective Assoc.*, 118 Nev. 889,

2  897-98, 59 P.2d 1212, 1218 (2003).[7]

3        Plaintiff argues that the attorney-client privilege does not extend to Defendant's counsel's

4  communications with an *independent* adjuster such as GAB Robins North America, Inc. or a consultant

5  such as  MKA, because they are not employees of the Defendant.  Neither Plaintiff's Motion nor

6  Defendant's Opposition cited any legal authority on this issue.  Plaintiff's *Reply (#94)* cites two

7  decisions in support of its argument that the privilege does not apply.  *Export-Import Bank v. Asia Pulp

8  & Paper Co.*, 232 F.R.D. 103, 113-14 (S.D.N.Y. 2005) and *Horton v. United States,* 204 F.R.D. 670,

9  672-7 (D. Colo. 2002).  Neither of these cases deal with the application of the privilege as it relates to

10  communications with independent insurance adjusters.

11        Both *Export-Import Bank* and *Horton* cited *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994), which

12  held that the *Upjohn* test may extend to communications between a corporation's or company's attorney

13  and an independent contractor who is "the functional equivalent of an employee."  *Bieter* states in this

14  regard as follows:

15         Such [confidential] information will, in the vast majority of cases be
available from the client or the client's employees, but there undoubtedly
16         are situations ... in which too narrow a definition of "representative of the
client" will lead to attorneys not being able to confer confidentially with
17         nonemployees who, due to their relationship to the client, possess the
very sort of information that the privilege envisions flowing most freely.
18         "[I]t is only natural that", just as "middle-level – and indeed lower-level
employees ... would have the relevant information needed by corporate
19         counsel if he is adequately to advise the client with respect to ... actual or

20

21      [7]As *Connecticut Indemnity Co. v. Carrier Haulers, Inc.*, 197 F.R.D. 564, 572 (W.D.N.C. 2000)

22  states, applying the attorney-client privilege in the context of insurance claims is particularly difficult.
Where an attorney acts as a claims adjuster, claims process supervisor, or claim investigation monitor,

23  and not as a legal adviser, the attorney-client privilege does not apply.  *Connecticut Indemnity Co. v.
Carrier Haulers, Inc., supra*; Mission *Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 163 (D. Minn. 1986);

24  *Continental Cas. Co. v. Marsh*, 2004 WL 42364 (N.D. Ill. 2004).  The line between what constitutes

25  routine claim handling and the rendition of legal advice, however, is not necessarily clear.  *Connecticut
Indemnity Co.* notes that the fact that the attorney's assigned duties are investigative in nature does not

26  mean that the privilege does not apply.  The court stated that "[t]he relevant question is not whether [the

27  attorney] was retained to conduct an investigation, but rather, whether this investigation was related to
the rendition of legal services."  197 F.R.D. at 572.

28

1    potential difficulties"..., so too would nonemployees who possess a
     "significant relationship to the [client] and the [client's] involvement in
2    the transaction that is the subject of legal services."  (citations omitted)

3    *Bieter, supra,* 16 F.3d at 937-38.

4        As with corporate employees, application of the privilege to communications with an

5    independent contractor is determined on a case-by-case basis.  *Export-Import Bank, supra,* states that

6    courts look to whether the consultant had primary responsibility for a key corporate job, whether there

7    was a continuous and close working relationship between the consultant and the company's principals

8    on matters critical to the company's position in litigation, and whether the consultant is likely to possess

9    information possessed by no one else at the company.  Courts have reached varying results in applying

10   this test.  *See Bieter*, *supra,* (consultant who was contracted to provide advice and guidance regarding

11   commercial and retail development for the company was a functional equivalent of an employee);

12   *Horton, supra,* (property management company was not the functional equivalent of an employee of the

13   property owner); *Export-Import Bank, supra,* (financial consultant was not the functional equivalent of

14   an employee); *In re Copper Martket Antitrust Litigation*, 200 F.R.D. 213, 218-19 (S.D.N.Y. 2001)

15   (public relations consultant who consulted with the company's counsel regarding a pending

16   investigation was the functional equivalent of an employee);  *Royal Surplus Lines Insurance Co. v.*

17   *Sofamor Danek Group, Inc.*, 190 F.R.D. 463 (W.D. Tenn. 1999) (insurance broker for the insured who

18   consulted with the insured and its counsel regarding an insurance policy dispute was a corporate

19   representative); *Western Resources v. Union Pacific Railroad Co.*, 2002 WL 181494 (D. Kan. 2002)

20   (expert consultant retained in anticipation of litigation was corporate representative within scope of

21   attorney-client privilege).

22       The Court has not found any case applying the *Upjohn* and *Bieter* tests in regard to whether an

23   independent insurance adjuster is the functional equivalent of an employee of the insurer.  In a

24   somewhat different context, the court in *Lower v. Rucker*, 576 N.E.2d 422, 424 (Ill.App. 1991), held

25   that an insured's statement to an independent insurance adjuster employed by the insurer was protected

26   by the attorney-client privilege to the same extent that his statement would have been protected if given

27   to an employee of the insurer.  The court stated:

28   . . .

18

> While we appreciate the factual distinction between a statement given by an insured to an employee of his insurer, and a statement given to an independent contractor retained by his insurer, in our view, and for purposes of the privilege, it is a distinction without a difference. In either case, the statement is given at the request of the insurer who has an obligation to defend the insured, and we fail to see how the motives and interests of the insured in giving a statement about an accident would be any different depending on whether he was communicating with an employee of the insurer who was investigating the accident or with an independent contractor who was investigating the accident on behalf of the insurer. If the communication between the insured and insurer is privileged (citation omitted), we can perceive no reason why the communication between the insured and the independent investigator should not also be privileged.

In so holding, the court disagreed with a prior Illinois decision in *Shere v. Marshall Field & Co.*, 327 N.E.2d 92 (Ill.App. 1974).

In *Rager v. Boise Cascade Corp.*, 1988 WL 84724 (N.D. Ill. 1988), the court held that an independent contractor who was hired by the employer to respond to employee claims for unemployment compensation and to act as the employer's agent and representative and assist it in preparing for administrative proceedings relating to such claims was a corporate agent within the scope of the attorney-client privilege. The court looked to whether the agent has the power to affect the legal relations of the principal and others, whether the agent is a fiduciary who works on behalf of the principal and primarily for his benefit, and whether the principal has the right to control the conduct of the agent.

NRS 684A.020.1(a) defines an adjuster as a person who, for compensation as an independent contractor or for a fee or commission, investigates, settles and/or reports to his principal relative to claims arising under insurance contracts for property, casualty or surety coverage. An "independent adjuster" means an adjuster representing the interests of an insurer or self-insurer. NRS 684A.030.1. Although it is questionable whether an independent adjuster is a fiduciary of the insurer that employs him, under *Upjohn* the privilege is not limited to employees who are fiduciaries. Whether the insurer employs independent adjusting companies to investigate and handle claims or conducts such activities through an "in-house" claims department, the insurer is responsible for supervising the conduct of its agents and is legally liable to the insured for their bad faith conduct in handling the claim regardless of whether they are employees or independent contractors. *See* Couch on Insurance 3d. § 48.63. *See also*

19

1   *Republic Ins. Co. v. Hires,* 107 Nev. 317, 810 P.2d 790 (1991); *Albert H. Wohlers & Co. v. Bartgis*, 114

2   Nev. 1249, 969 P.2d 949 (1998).  The Court, therefore, finds that an independent adjuster handling the

3   investigation of a claim for the insurer is the functional equivalent of a claims employee of the insurer.

4        The Court sees no rational distinction between applying the attorney-client privilege to

5   confidential communications between the insurer's counsel and its claims employee,  *Yurick v. Liberty*

6   *Mutual Ins. Co., supra*;  *State Farm Fire & Cas. Co. v. Superior Court, supra,* but refusing to apply the

7   privilege to counsel's confidential communications with an independent insurance adjuster who

8   performs the same functions as an "in-house" claims employee.  The Court, therefore, finds that

9   confidential communications between Defendant's coverage counsel and Defendant's adjuster GAB

10  Robins North America, Inc., for purposes of providing legal advice or to obtain information in order to

11  render legal advice to the Defendant, are entitled to protection under the attorney-client privilege.

12       Following the initial denial of coverage and after Defendant agreed in February 2005 to conduct

13  a further coverage investigation and possibly reconsider its coverage denial, "[i]t was agreed with the

14  client that Mr. Sowers [GAB's adjuster] was to then retain MKA to provide *construction expertise* to

15  assist him in his investigation." (Emphasis added)  *Second Supplemental Declaration of Defendant's*

16  *counsel, C. Michael Johnson (#111-2).*  Although the Court has not been provided with a copy of

17  MKA's final report produced in this litigation, the draft report of MKA contained in the documents

18  submitted for the Court's *in camera* review, document numbers GAB 004399-004423, indicates that

19  MKA performed an expert analysis regarding the cause and origin of the water damage to Plaintiff's

20  building.  The Court, therefore, finds that MKA was retained by Defendant as an expert consultant and

21  not as a claims adjuster.[8]

22       Courts applying the *Upjohn* and *Bieter* tests have also held, however, that confidential

23  communications between a party's counsel and a *non-testifying expert or consultant*, hired in

24  anticipation of litigation are protected by the attorney-client privilege.  *See Western Resources v. Union*

25

26       [8]No information has been provided to the Court to suggest that MKA is engaged in the business

27  of adjusting insurance claims or that it is licensed in that capacity by the State of Nevada.  By the same
    token, no evidence has been provided to the Court, nor is it reasonable to infer, that Defendant's

28  business includes providing expert water intrusion cause and origin analysis.

1  *Pacific Railroad Co.*, 2002 WL 181494 (D. Kan. 2002);  *Fru-Con Const. Corp. v. Sacramento Mun.*

2  *Utility Dist.*, 2006 WL 2255538 (E.D. Cal. 2006); *In re Grand Jury Subpoena Dated March 9, 2001*,

3  179 F. Supp.2d 270, 283 (S.D. N.Y. 2001).  *See also State v. Riddle*, 964 P.2d 1056, 1062 (Or.App.

4  1998).  If the consultant is designated as an expert trial witness, however, his or her communications

5  with counsel regarding the subject matter of the testimony are not protected from disclosure by the

6  attorney-client privilege.  *See Synthes Spine Co., L.P. v. Walden*, 232 F.R.D. 460, 463-464 (E.D. Pa.

7  2005); *American Fidelity Assurance Co. v. Boyer,* 225 F.R.D. 520, 521-22 (D.S.C. 2004);  *Western*

8  *Resources v. Union Pacific Railroad Co., supra.*   As *American Fidelity Assurance Co., supra,* states: "it

9  is essential during pretrial discovery that the parties be able to discover not only what an opposing

10  expert's opinions are, but also the manner in which they were arrived at, what was considered in doing

11  so, and whether this was done as a result of an objective consideration of the facts, or directed by an

12  attorney advocating a particular position."  225 F.R.D. at 522, quoting *Musselman v. Phillips,* 176

13  F.R.D. 194, 198 (D. Md. 1997).  Therefore, if Defendant intends to have MKA's personnel provide

14  expert witness testimony in this case regarding its evaluation of the water intrusion or property damage

15  sustained by Plaintiff, then the attorney-client privilege has been waived as to any communications with

16  or provided to MKA.

17        The Court's determination regarding whether the attorney-client privilege applies to documents

18  submitted for its *in camera* review is, therefore, subject to the proviso that if MKA is an expert witness

19  in this case, any communications with or provided to it are discoverable, and should be produced to

20  Plaintiff.  The Court will refer to the file numbers, 5.a through 5.g, of the documents provided for the

21  Court's *in camera* review and which are summarized and described in the  *Supplemental Declaration of*

22  *Defendant's counsel, C. Michael Johnson (#104).*  Based on its review of the documents submitted for

23  *in camera* review, the Court finds as follows:

24        1.     File 5.a.  Document ACE CLM 001153-001175 is a draft of the second denial of

25               coverage letter sent to Plaintiff's counsel in September, 2005.  According to Defendant's

26               counsel, this draft was provided only to the Defendant ACE.  The Court therefore finds

27               that this document is protected by the attorney-client privilege.

28  . . .

2.      File 5.b.   This file consists of emails and attachments between Defendant's counsel,
Defendant's representative, John Adair, GAB adjuster, Mr. Sowers, and LeRoux Konig
of MKA  regarding the investigation of the coverage issues.   The Court finds that these
documents relate to providing legal advice or legal analysis in regard to the claims
investigation.   However, to the extent that Mr. Konig or other MKA representatives are
expert witnesses in this case, the privilege has been waived and the documents should be
produced to Plaintiff.

3.      File 5.c.  The Court finds that portion of ACE CLM 640 that was redacted is attorney-
client privileged information and has been properly redacted.

4.      File 5.d.  The Court finds that ACE CLM 45 and ACE CLM 1151, which relate to
analysis of the issues alleged in Plaintiff's Complaint, including the bad faith claims are
protected work product.

5.      File 5.f.  The Court finds that GAB 232-239 and GAB 3911-3914 are protected by the
attorney-client privilege based on its conclusion that GAB's employee, Mr. Sowers, is
the functional equivalent of an employee of Defendant.

The Court finds that GAB 4395-4423 is not privileged from disclosure if MKA's
personnel are expert witnesses in this case.   The other documents listed in this section as to
which privilege is claimed are also protected unless the documents were provided to MKA and
its personnel are expert witnesses in this case.

6.      File 5.g.  The Court finds that the redacted diary entries simply refer to the fact that
coverage counsel is working on a coverage opinion.   No opinions of coverage counsel
are disclosed.   The Court does not believe these entries disclose or reveal any
confidential communications and should be produced.   As to ACE CLM 7507, the Court
finds that reserve information, while not privileged, is generally irrelevant and need not
be produced.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Compel Production of Documents and
Request for Sanctions (#80) is **Granted,** in part, as follows:

22

1.   Defendant shall produce to Plaintiff the "stand alone" builder's risk policies relating to policy forms entitled "ACE USA Project Builder's Risk," "ACE USA Builder's Risk Large Accounts," (if any) and "ACE USA Builder's Risk Xtra" issued by Defendant's "Inland Marine Division" during the period from January 1, 2003 to January 1, 2005.  Defendant shall also produce the binders for the policies issued under those forms.

2.   To the extent that LeRoux Konig or other representatives of MKA are persons whom Defendant expects to call as expert witnesses at the time of trial, Defendant shall produce all communications exchanged between Defendant, its adjuster of GAB Robins North America, Inc., and/or Defendant's counsel and LeRoux Konig or other representatives of MKA.

3.   Defendant shall produce other allegedly privileged documents to the extent directed to do by the foregoing provisions of this order.

4.   No sanctions will be imposed on Defendant.

DATED this 1st day of November, 2006.


GEORGE FOLEY, JR.
U.S. MAGISTRATE JUDGE

23